PEOPLE v HARDEN

PEOPLE v RITTENBERRY

1. SEARCHES AND SEIZURES—WITHOUT WARRANT—PLAIN VIEW.

A police officer, in order to apply the plain view doctrine to justify a warrantless seizure of evidence, must be rightfully in a position where the evidence is plainly visible, must have prior justification for his intrusion, and must discover the evidence inadvertently.

2. SEARCHES AND SEIZURES—WITHOUT WARRANT—PLAIN VIEW—JUSTIFIABLE INTRUSION.

Police officers' initial intrusion into a residence was limited and justifiable and provided a basis for a later seizing of evidence without a warrant under the plain view doctrine where a next door neighbor who had been given a key, told to watch the house by the owners, and told that no one was to be inside, had called the police to investigate activity at the residence, and where, in response to a knock on the door and questioning, the police had been admitted to the foyer.

3. SEARCHES AND SEIZURES—WITHOUT WARRANT—PLAIN VIEW—JUSTIFIABLE INTRUSION.

Police intrusion into the kitchen of a private residence without a warrant was reasonable and justifiable following a justifiable entry into the foyer of the home where: first, testimony indicated that the police had been told that no one was supposed to be in the home because the owners were on vacation, second, when a son of the owners had met with the police in the foyer his hand was bleeding profusely, and, third, the officers had been led to believe that three persons they had seen from the foyer were the only persons in the house, and yet, after hearing noises, two other persons were found in a bedroom; under these circumstances, entry into the kitchen in quest of an explana

REFERENCES FOR POINTS IN HEADNOTES
[1–4] 68 Am Jur 2d, Searches and Seizures §§ 23, 88, 94.
Search and seizure: Observation of objects in "plain view"—Supreme Court cases. 29 L Ed 2d 1067.
[4] 68 Am Jur 2d, Searches and Seizures § 96.

tion from defendants of the presence of the two strangers cannot be characterized as unreasonable, and evidence of a breaking and entering discovered inadvertently by the police in the kitchen was admissible under the plain view doctrine.

4. SEARCHES AND SEIZURES—WITHOUT WARRANT—REASONABLENESS—
   HOMES—MOVING VEHICLES.

   Greater foundational facts are necessary to support a finding that a police intrusion was constitutionally reasonable when a house or a home is involved than if a moving vehicle were involved.

Appeal from Oakland, Arthur E. Moore, J. Submitted Division 2 May 13, 1974, at Lansing. (Docket Nos. 16737, 16738.) Decided July 22, 1974.

Ronald D. Harden and Jackie Rittenberry were convicted of breaking and entering with intent to commit larceny. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, and *T. S. Givens,* Assistant Appellate Counsel, for the people.

*Kennedy, Carson, Fischer & Potts* (by *David William Potts* and *David P. Philips),* for defendants.

Before: DANHOF, P. J., and T. M. BURNS and CARLAND,* JJ.

DANHOF, P. J. Defendants were found guilty by a jury of breaking and entering with intent to commit larceny. MCLA 750.110; MSA 28.305. On January 25, 1973, each defendant was sentenced to a term of five to ten years in prison. They appeal. We affirm.

James Fiss, a neighbor of defendant Harden's

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

parents, testified that at about 5 a.m. on October 14, 1972 he was awakened in his home by a loud noise. He got up in time to see a car roll into his driveway. Two people jumped out of the car and disappeared into the darkness. This incident drew his attention to the nearby Harden residence because he knew that the owners were away. The vacationing Hardens had given Mr. Fiss a key to the residence and had told him that no one was supposed to be inside. Fiss then noted that the lights in the house were on and that a second strange car was in the Harden driveway. Fiss called the sheriff's department. The responding officer, Deputy Brown, was informed of the circumstances by Mr. Fiss.

Brown walked toward the Harden house to conduct a further investigation. On his way, he noticed that the lights had been turned out. Drawing his gun, Brown knocked on the Hardens' door. Defendant Rittenberry answered and identified himself as a guest of the owner's son. When questioned further as to defendant Harden, Rittenberry said, "Come on, I will get him". The deputy reholstered his gun and stepped inside. He remained in the foyer while Rittenberry went into the back of the house. While waiting for Rittenberry, Brown saw a third person—later identified as one Gary Wyman—apparently sleeping on a rollaway bed in the living room.

Rittenberry returned with Harden, and Mr. Fiss identified him as the owner's son. The deputy contemporaneously noticed that Harden's right hand had been severely cut. When asked about his hand, Harden responded somewhat vaguely that he had been hurt in a fight considerably earlier in the evening. The deputy noticed, however, that the untreated wound was bleeding profusely. Deputy

Brown asked whether Harden, Rittenberry, and Wyman were the only ones in the house and apparently received an affirmative answer.

While this conversation was taking place, a backup officer, Deputy Eno, arrived on the scene. As the two officers conversed in the foyer, they heard a "thud" or a series of "thuds" from the back portion of the house. They investigated these noises and in the back bedroom discovered a fourth male subject lying in a bed apparently sleeping and a young female slumped in a closet apparently passed out. Eno returned from the back bedroom and went into the kitchen where defendants apparently were at the time. Eno called out to Brown, and he too entered the kitchen. The kitchen was in disarray. On top of a dryer near the kitchen table, Brown saw an electric scalpel with a good deal of blood on it. On top of the kitchen table, he observed a pile of glass tubes filled with a clear liquid and labeled in medical terms.

Brown then placed a call to his command deputy. Area cars were alerted to a possible B & E at a doctor's office. A third officer, Deputy Theunick, received the alert while on his way to the Fiss residence. He remembered that there was a dentist's office near the Fiss address. Upon arrival at the dentist's office, he discovered that it had been broken and entered. All five subjects were placed under arrest. In the Oakland County Jail, defendants' shoes were seized. An examination of the shoes revealed what appeared to be particles of glass embedded in the soles. At trial, the shoes were admitted as evidence.

The sole issue raised on appeal is whether defendants' arrest and booking was irreparably tainted by the initial discovery of the stolen goods

in the Harden kitchen. Defendants contend that their arrest was a product of an illegal search and seizure in violation of US Const, Amendment IV and Const 1963, art 1, § 11.

For purposes of this opinion, we will assume, without deciding, the following: That defendants did not consent to the challenged police conduct and that Mr. Fiss did not or could not consent thereto; That defendants have standing to raise the issue of illegal search;[1] That there is a proper relationship between the issue raised on appeal and defendants' motion to suppress.[2]

In *People v Whalen,* 390 Mich 672, 677; 213 NW2d 116, 119 (1973), our Supreme Court distinguished between seizure which is the product of a search and seizure of items in plain view:

"As stated by the United States Supreme Court in *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971) the basic constitutional rule in this area is that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment —subject only to a few specifically established and well delineated exceptions.

"However, before the above rule can be applied, and the exceptions to it come into play, it first must be established from the facts before the court, that a search did in fact take place for Fourth Amendment purposes.

---

[1] The trial record contains no indication that defendant Harden resided in his parents' home, nor that the owners knew of or approved of the single night's usage. Furthermore, defendant Rittenberry testified that prior to the arrival of the police, defendant Harden was destroying parts of the house's interior with an electric hand saw.

[2] There was no pretrial motion to suppress evidence. During trial, defendants requested and were granted an evidentiary hearing relating to the admissibility of defendants' shoes which were seized following arrest as part of the booking procedure at the Oakland County Jail. The scalpel seized at the Harden residence and photographs of the medical supplies were received into evidence without objection.

"From *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967) there has evolved a test, applied by the courts, to determine whether or not a search, by Fourth Amendment standards, has indeed taken place. Simply put, if an individual has a reasonable expectation of privacy in the area searched, or the materials seized, a search has been conducted. 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' *Katz, supra,* 351.

"Thus seizure of objects within the plain view of an officer, lawfully in a place where he had a right to be, are not proscribed by the Constitution. *United States v Lee,* 274 US 559; 47 S Ct 746; 71 L Ed 1202 (1927)."

For the plain view doctrine to apply, the officer must be rightfully in a position where the evidence is plainly visible. There must be a prior justification for his intrusion and discovery of the evidence must be inadvertent:

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge v New Hampshire,* 403 US 443, 466; 91 S Ct 2022, 2038; 29 L Ed 2d 564, 583 (1971).

On the facts of this case, we hold that the initial intrusion into the Harden residence was limited

and justifiable. Deputy Brown had been directed to the house by the next door neighbor who had been given a key, told to watch the house by the owners, and told that no one was to be inside. In response to Brown's query about Rittenberry's presence in the house, the latter answered, "Come on, I will get him [Harden]". Brown entered, but remained in the foyer. Soon thereafter Deputy Eno arrived and entered, but also remained in the foyer.

Defendants argue that once Mr. Fiss identified defendant Harden, the justification for police intrusion ceased to exist. This contention ignores the following facts: First, the testimony is clear that Brown had been told that no one was supposed to be in the house. Second, when Harden did come forward, his hand was bleeding profusely. Third, the officers were led to understand that Harden, Rittenberry, and Wyman were the only persons in the house. It was only after the occurrence of the "thud" or "thuds" that the officers went further into the house to investigate.

There was, therefore, a prior justification for the intrusion. It is also clear that the evidence seized was in plain view and that its discovery was inadvertent. The tubes labeled in medical terms were on top of a dryer in the kitchen. The electric scalpel was on top of the kitchen table. The record indicates that Deputy Eno entered the kitchen only after the discovery of the two strangers in the bedroom, one a young female slumped in the closet. Under the circumstances, entry into the kitchen in quest of an explanation from defendants of the presence of the two strangers cannot be characterized as unreasonable. Finally, the discovery of the evidence in the kitchen, combined with Deputy Theunick's knowledge of the burglary of

the dentist's office, constituted probable cause for the ultimate arrest and booking.

The subject of police intrusion in this case was a private residence. This Court is aware of its consequential seriousness:

"The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v United States,* 365 US 505, 511; 81 S Ct 679, 683; 5 L Ed 2d 734, 739 (1961).

Greater foundational facts are necessary to support a finding that the intrusion was constitutionally reasonable when a house or a home is involved than if a moving vehicle were involved.[3] After close scrutiny of all of the attendant facts, we hold that the challenged police conduct in this case was reasonable. The existing circumstances were such as to create a reasonable and honest belief in the minds of the investigating officers that the law was being violated. The fact that the initial intrusion was limited and then extended only after further unexplained occurrences argues against a finding that this was a general exploratory search. Discovery of the evidence in the kitchen was not anticipated and the officers were legitimately in a position which brought the evidence into plain view.

Affirmed.

All concurred.

---

[3] "Fewer foundation facts are necessary to support a finding of reasonableness when moving vehicles are involved, than if a house or a home were involved." *People v Whalen, supra,* 682.