668 So.2d 122 (1995)
A.A.G.
v.
STATE.
CR 93-1877.
Court of Criminal Appeals of Alabama.
April 14, 1995.
Rehearing Denied July 7, 1995.
*124 Richard E. Dick, Huntsville, for Appellant.
Jeff Sessions, Atty. Gen., and Jean Brown, Asst. Atty. Gen., for Appellee.
LONG, Judge.
This appeal is from an adjudication of delinquency.
By an amended delinquency petition, the appellant, 15-year-old A.A.G., was charged with obstructing governmental operations, a violation of § 13A-10-2, Ala.Code 1975. Following a delinquency hearing, the juvenile court entered an order finding the appellant delinquent as charged and fining her $50.
The appellant contends that the adjudication of delinquency should be reversed because, she says, the state's evidence did not establish the elements of the charged offense.
Section 12-15-65(e), Ala.Code 1975, requires that an adjudication of delinquency be supported by "proof beyond a reasonable doubt, based on competent, material[,] and relevant evidence." The credibility of witnesses and the truthfulness of testimony in delinquency proceedings is for the trier of fact to determine. C.T.L. v. State, 599 So.2d 94 (Ala.Cr.App.1992). Furthermore, in resolving questions of sufficiency of the evidence, this court must view the evidence in the light most favorable to the state. Id.
The evidence in this case, viewed most favorably to the state, tended to show that on the evening of March 20, 1994, a dispatcher for the City of Madison Police Department was notified by ADT Security Systems that a burglar alarm had gone off at 102 Lake Shore Drive, a private residence in Madison. ADT, a home security company, had installed the alarm at the residence and monitored it pursuant to a contract with the homeowner, the appellant's father. After receiving the call from ADT, the dispatcher notified Officer Anthony Melton and Lieutenant Christopher Robinson to investigate the alarm, informing the officers that no contact could be made with anyone at the house because the telephone had been disconnected. The dispatcher did not provide the officers with the name of the owner of the house, and the officers testified that they were unaware of who lived at the house when they went to investigate.
The officers arrived at the house shortly after they were dispatched. No exterior lights were on, and except for some light emanating from an interior room, the house was essentially dark. The officers did not see any vehicles parked outside. They checked the front yard and the side yard, and found nothing particularly unusual; however, their access to the backyard was obstructed by a privacy fence. As he approached the house, Officer Melton saw some movement inside and heard what sounded like a television or a stereo. Lieutenant Robinson walked onto the front porch and looked through the window. He saw a black female juvenile, later identified as the appellant, standing inside the house at the top of a stairway. As Officer Melton stood at the *125 foot of the porch, Lieutenant Robinson rang the doorbell, knocked several times, and identified himself as a police officer. The appellant then came to the window and looked outside. The porch light came on, and, according to Lieutenant Robinson, the appellant looked at him through the window. The officers identified themselves and illuminated themselves with a flashlight so that the appellant could see their police uniforms. However, instead of opening the door, the appellant turned off the porch light, turned around, and walked back into the interior of the house. The officers testified that the appellant's actions concerned them. Officer Melton stated that he advised Lieutenant Robinson at that time that something was wrong. He stated that he had some concern that someone else might be in the house prohibiting the appellant from opening the door.
After the appellant walked away from the door, Lieutenant Robinson knocked again, telling the appellant that "we weren't playing games, that this was the Madison Police Department, and we needed for her to open the door." The appellant returned to the door, and this time she opened it. According to Officer Melton, the appellant "slung" the door open in a hostile manner. In what Lieutenant Robinson described as "a rather belligerent tone," the appellant then asked the officers what they wanted. The officers testified that the appellant's belligerent attitude added to their concerns that something was wrong at the residence. Lieutenant Robinson informed the appellant that the burglar alarm had gone off and that he and Officer Melton needed to check the house. He then stepped past the appellant into the house, taking a few steps into the foyer and looking around to see if everything was all right. At that point, he observed two other female juveniles, later identified as the appellant's 13-year-old twin sisters, standing at the rear of the foyer area.
Officer Melton, who had entered the house behind Lieutenant Robinson, asked the girls for their names and told them why he and Lieutenant Robinson were there. The appellant, whose attitude Officer Melton described as "combative," told the officers that she lived at the house and that nothing was wrong. She then told the officers that she could "get some ID" and started to walk into the interior of the house. However, Lieutenant Robinson instructed her to remain where she was for the time being. Lieutenant Robinson testified that the appellant's unusual behavior led him to believe that something was wrong; he stated that he thought the appellant might be acting from fear that somebody was in the house or that she had been "put under duress that, you know, get rid of the cops no matter what." According to Lieutenant Robinson, even though the appellant had stated that she lived in the house, his main concern at the time was not whether it was, in fact, the residence of the three girls, but whether a burglary had been committed and whether the minors were safe. As Officer Melton stayed with the girls in the foyer area, Lieutenant Robinson proceeded through the upstairs and downstairs rooms of the house to search for any intruders.
As Lieutenant Robinson searched the house, looking anyplace that someone could have hidden, one of the appellant's sisters told Officer Melton that there had been a false alarm on the home's burglary system. Although the officers had instructed all three girls to remain with Officer Melton in the foyer, just after Lieutenant Robinson began his search, the appellant rushed toward the back of the house. Officer Melton ordered the appellant to stop; however, she refused and instead went into the den, an area of the house that had not yet been secured by the officers. Officer Melton followed the appellant into the den, where he caught her by the arm and sat her on a couch, telling her to stay seated and to calm down until he and Lieutenant Robinson could complete their investigation. Officer Melton testified that while Lieutenant Robinson was conducting his search, the appellant continually jumped up from the couch and flailed her arms, striking him in the process of apparently attempting to get away. He stated that he was forced to restrain the appellant by placing his hands on her shoulders. According to Officer Melton, the appellant began to scream, telling him that it was her house, that the officers were not supposed to be there, and that they could not do what they *126 were doing. The appellant's sisters tried without success to calm her down.
The appellant eventually eluded Officer Melton and ran into the hall. After ordering her to stop, Officer Melton once again grabbed the appellant by the arm. The appellant struggled, flailing her arms and striking Officer Melton several times. The appellant continued "screaming, hollering, and pushing" the officer until he finally told her that she was under arrest for disorderly conduct. Lieutenant Robinson, who observed only the end of this altercation, stopped his search of the house to assist Officer Melton in the arrest. According to Lieutenant Robinson, he then talked with one of the appellant's sisters and became satisfied that this was the girls' residence and that their parents were out and would be back later.
Lieutenant Robinson stated that while he did not observe much of the altercation between Officer Melton and the appellant, he did hear the appellant shouting as Officer Melton attempted to calm her down. He testified that because he was forced to assist Officer Melton with the appellant, he was unable to finish his search of the house. He stated that he searched the house for approximately two or three minutes before he was forced to stop. After the appellant was arrested, she was transported to the police station. The original charge of disorderly conduct was later amended, and the appellant was charged with obstructing governmental operations.
Officer Melton testified that ordinarily he would have assisted Lieutenant Robinson in his search of the house after securing a safe area for the girls. However, he said, the appellant's actions prevented him from assisting Lieutenant Robinson at all.
The appellant and one of her sisters testified at the hearing. We note that their version of events often contrasted sharply with the testimony presented by the officers.
Section 13A-10-2, Ala.Code 1975, provides, in pertinent part:
"(a) A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independent unlawful act, he:
"(1) Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or
"(2) Intentionally prevents a public servant from performing a governmental function."
A "governmental function" is defined at § 13A-10-1, Ala.Code 1975, as "[a]ny activity which a public servant is legally authorized to undertake on behalf of a government." (Emphasis added.) The appellant contends that the actions of the officers in entering and searching the house contravened the Fourth Amendment proscription against unreasonable searches and seizures and that, therefore, the state failed to show that the officers were performing a legally authorized activity when the appellant's alleged interference occurred.[1]
It is well settled that warrantless entries to and searches of a residence are presumptively unreasonable and that the burden is on the government to demonstrate exigent circumstances justifying a warrantless entry and search. Welsh v. Wisconsin, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); Landreth v. State, 600 So.2d 440 (Ala.Cr.App. 1992). To justify a warrantless entry and search, the state needs to show both the existence of probable cause and exigent circumstances. United States v. Rodgers, 924 F.2d 219 (11th Cir.1991), cert. denied, 501 U.S. 1221, 111 S.Ct. 2834, 115 L.Ed.2d 1003 (1991), appeal after remand, 981 F.2d 497 (11th Cir.1993); Etheridge v. State, 414 So.2d 157 (Ala.Cr.App.1982).
Here, the officers received a report from the police dispatcher that a burglar alarm had sounded at a house monitored by a home security company. There was testimony that the police dispatcher informed the officers that no contact could be made with anyone at *127 the house because the telephone had been disconnected. Thus, the officers were responding to a possible burglary in progress. The officers arrived at the address of the reported alarm shortly after they were dispatched. The house was basically dark, and one of the officers saw some movement inside the residence. Although the officers could find no outward indications of a break-in when they initially checked the house, the evidence showed that the officers' access to the backyard was blocked by a fence and that they were therefore unable to inspect all sides of the house. After the officers knocked on the front door, rang the doorbell, and identified themselves to the appellant as she looked at them through the window, the appellant behaved suspiciously, turning off a porch light that she had turned on and then walking away from the door, even though it was apparent that she was being asked to open the door by two uniformed police officers. At this point in time, the officers could not know whether the appellant was lawfully present in the house. When the appellant finally opened the door, she continued to behave peculiarly. The officers described the appellant's manner as "hostile" and "belligerent," and under the circumstances, the officers could reasonably have concluded that the appellant was a participant in a burglary or that, even if she resided at the house, she was in jeopardy and was acting under duress. Officer Melton testified that, based on the appellant's unusual behavior, he was concerned that someone in the house may have threatened the appellant or prohibited her from opening the door. Therefore, even if the officers believed that the appellant lived in the house, her behavior, coupled with the other circumstances known to the officers (i.e., the reported activation of the burglar alarm, the darkness of the house, the movement inside the house, the officers' inability to inspect the back of the house), furnished the officers with probable cause to go forward with the investigation and to enter the house.
The establishment of probable cause requires only that facts available to the officer at the moment of search would warrant a person of reasonable caution to believe that the action taken by the officer was appropriate. Lott v. State, 456 So.2d 857 (Ala.Cr. App.1984). Viewing the evidence in this case most favorably to the state, as we must, we find that the officers had probable cause to enter the residence. See People v. Williams, 160 Mich.App. 656, 408 N.W.2d 415 (1987) (officers who heard burglar alarm sound and observed footprints leading to open window had probable cause for warrantless entry and search of house); B.P.O.E. # 576, Elks Club v. State, 413 N.E.2d 660 (Ind.App.1980) (officers checking building where burglar alarm had sounded and noticing light emanating from basement acted reasonably in entering premises to check for someone who might be hiding).
Moreover, the scope of the officers' intrusion did not exceed what was justified by the circumstances. The appellant's uncooperative conduct after the officers stepped into the residence certainly did nothing to dissipate the probable cause that occasioned their entry. Because of the appellant's inexplicably combative behavior, the officers could not be expected to accept at face value the appellant's claim that she lived in the house. See People v. Harden, 54 Mich.App. 353, 220 N.W.2d 785 (1974) (when officers discover persons in house where suspected burglary-in-progress has been reported and those persons assert to officers that their presence is lawful, officers need not immediately accept such a claim at face value, especially if other circumstances known to officers leave the situation ambiguous). Even if the appellant and her sister partially satisfied the officers' suspicions, the appellant's strange behavior could have induced a reasonable belief in the officers that the appellant was fearful because of the presence of a hidden intruder. There is nothing in the record to suggest that the officers entered the house for any purpose other than to secure the premises and to protect the occupants by ascertaining whether a burglar was inside. The search of the house was limited to places where a suspect might hide. Under these circumstances, the officers' actions were reasonable.
Despite the fact that the officers ultimately determined that the appellant lived in *128 the house, and despite the appellant's testimony at the hearing providing at least facially plausible explanations for some of her actions, the officers' actions at the time of the search were nonetheless reasonable. Hindsight may not be employed to assess whether a search was reasonable; the information that must be considered in evaluating probable cause for a warrantless search is that information available to the officers at the time of the search. Gouin v. State, 581 So.2d 1279 (Ala.Cr.App.1991).
We also find that exigencies existed in this case that justified the officers' prompt entry without first obtaining a warrant. The officers were placed in the position of investigating a possible burglary in a house occupied by a juvenile who was either unwilling or unable to cooperate in the investigation, and whose behavior presented a possible danger to herself, to the officers, and to two other minors on the premises.
"The presence or absence of exigent circumstances must be examined as the circumstances arise." Rodgers, supra, 924 F.2d at 223. "For the purpose of protecting the property of the owner or occupant, law enforcement officers may enter a residence without a warrant where they reasonably believe that the premises are being or have recently been burglarized." Terry v. State, 469 So.2d 1359 (Ala.Cr.App.1985), cert. denied, 474 U.S. 826, 106 S.Ct. 84, 88 L.Ed.2d 69 (1985). In addition to ensuring that evidence will not be destroyed, officers may conduct a warrantless search if they believe that their own lives or the lives of others are at risk. Warden v. Hayden, 387 U.S. 294, 298-99, 87 S.Ct. 1642, 1645-46, 18 L.Ed.2d 782 (1967).
"It would defy reason to suppose that ... [the police] had to leave the area and secure a warrant before investigating, leaving the putative burglars free to complete their crime unmolested. It is only `unreasonable' searches and seizures that the fourth amendment forbids."
United States v. Singer, 687 F.2d 1135, 1144 (8th Cir.1982), rev'd on other grounds on rehearing, 710 F.2d 431 (8th Cir.1983). Because the evidence showed that the officers legally entered and searched the house, the state established that the officers were performing a governmental function. §§ 13A-10-1 and -2.
The appellant also contends that her actions did not amount to "intimidation, physical force[,] or interference," as required by § 13A-10-2(a). The evidence showed that the appellant first delayed opening the door to the officers when they identified themselves. After the officers had entered the house and Lieutenant Robinson had begun to search for intruders, the appellant left the foyer and ran into another room of the house, despite the fact that the officers had explained their presence and had requested that the appellant remain with her sisters and with Officer Melton in a secure area. When Officer Melton managed to stop the appellant and to sit her on the couch, the appellant continually jumped up and struggled to run away. In the process of doing so, the appellant flailed her arms and struck Officer Melton. After the appellant eluded Officer Melton, she ran into the hall, where she struck the officer several more times. The evidence showed that the appellant's actions fully occupied Officer Melton's attention and prevented him from assisting Lieutenant Robinson in the search of the house. Additionally, Lieutenant Robinson was forced to curtail his search so that he could assist Officer Melton in arresting the appellant. The evidence sufficiently established that the appellant interfered with the officers in the performance of their duties.
The appellant also argues that there was no evidence that she had any intent to interfere with the officers. The evidence showed that the officers informed the appellant that the burglar alarm for the house had been activated and told her why they were conducting the search. However, the appellant was completely uncooperative, and for the few short minutes that Lieutenant Robinson was able to search for an intruder, the appellant engaged in a course of conduct that prevented Officer Melton from assisting Lieutenant Robinson and ultimately cut short Lieutenant Robinson's search. There was testimony that the appellant told the officers that they were not supposed to be in the house and that they could not *129 conduct a search. Intent may be shown by the words and actions of the accused and may be inferred from all of the surrounding circumstances. Heard v. State, 584 So.2d 556 (Ala.Cr.App.1991), appeal after remand, 594 So.2d 252 (Ala.Cr.App.1992). It can readily be inferred from the appellant's words and actions that she intended to interfere with the officers in the performance of their duties.
We find that sufficient evidence was presented to support the finding that the appellant was guilty of obstructing governmental operations. The adjudication of delinquency was supported by "proof beyond a reasonable doubt, based on competent, material[,] and relevant evidence." § 12-15-65(e), Ala.Code 1975. Accordingly, the judgment of the juvenile court is affirmed.
AFFIRMED.
All Judges concur; COBB, J., concurs specially.
COBB, Judge, concurring specially.
I concur in the result reached by the majority, but I believe that to conclude that the appellant did obstruct governmental operations, the majority must distinguish this case from Strange v. Tuscaloosa, 652 So.2d 773 (Ala.Cr.App.1994). In Strange, this court overturned a conviction for interfering with police officers, finding that their search of the appellant's home without her consent was a violation of her Fourth Amendment rights and citing Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).
In this case, the warrantless search by the police fell within one of the well-recognized exceptions set out in Strange. See also Wayne v. United States, 318 F.2d 205, 212 (D.C.App.1963), (Washington, J., concurring), cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963) ("Acting in response to reports ... the business of policemen ... is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with calm deliberation associated with the judicial process.").
Unlike the Strange case, where an adult was at the house when the police arrived, the potential danger to the children alone in this home was sufficient not only to justify a warrantless search, but to require it.
NOTES
[1] The commentary to § 13A-10-2 provides that "this section would not apply to illegal action by a public servant in performing an unauthorized function.".